## Sarah A. Simpkins
### v.
## A. W. Berggren et al.

Evidence—Of fraudulent transactions with other parties not admissible.—Appellant brought replevin for crops levied upon under an execution against her son. On the trial, evidence was permitted to be given tending to show that the son had given a chattel mortgage upon his personal property to his brother, for the purpose of hindering his creditors, and that it had been foreclosed under circumstances that indicated its fraudulent character. The record failing to show that appellant was in any way connected with it, or had any knowledge of its consideration or object, such evidence should have been excluded. It is not even presumptive proof that another and different transaction with other parties is alike fraudulent.

Appeal from the Circuit Court of Knox county; the Hon. Arthur A. Smith, Judge, presiding.

Mr. L. Douglass, for appellant; that the second instruction given for defendants was erroneous, there being no evidence on which to base it, cited Goodwin v. Durham, 56 Ill. 239; Holden v. Hulburd, 61 Ill. 280.

The fifth instruction given for defendants submitted to the jury matters of law, and was therefore improper: Adams v. Smith, 58 Ill. 417; Carter v. Carter, 62 Ill. 439; Herrick v. Gary, 65 Ill. 101; Baldwin v. Williams, 63 Ill. 550.

Mr. Adrian L. Humphrey, for appellees; contended that the pretended arrangement between appellant and her son was merely colorable, designed to cheat the son's creditors, and that while fraud must be proven, it may be proven by circumstances, and cited Boies v. Henney, 32 Ill. 130; Bowen v. Schuler, 41 Ill. 193; Slattery v. Stewart, 45 Ill. 293; Steere v. Hoagland, 39 Ill. 264; Bullock v. Narrat, 49 Ill 62; Reed v. Noxon, 48 Ill. 323; Bryant v. Simoneau, 51 Ill. 324; Rothgerber v. Gough, 52 Ill. 436; Swift et al. v. Lee, 65 Ill. 336.

That substantial justice has been done, and the Appellate Court will not interfere: N. E. F. & M. Ins. Co. v. Wetmore,

32 Ill. 221; Perkins v. Fisher, 39 Ill. 164; Van Buskirk v. Day, 32 Ill. 260; Morgan v. Peet, 32 Ill. 281; Durham v. Goodwin, 54 Ill. 469; Yundt v. Hartranft, 41 Ill. 9; Potter v. Potter, 41 Ill. 81; Jarrard v. Harper, 42 Ill. 457.

PILLSBURY, J. This was replevin brought by appellant against appellees, to recover 50 acres of standing corn and 20 acres of oats, which had been taken by appellees as sheriff and deputy, upon an execution against Benoni Simpkins, the son of appellant.

The premises where the grain was grown, were owned by Benoni Simpkins, the husband of appellant, in his lifetime, and by his last will and testament he devised the same to her during her natural life. Her son Benoni, the defendant in the execution, raised the grain in controversy, and the question upon the trial below was, whether it was liable to be taken in execution for his debts. It appears that for several years prior to 1876, he had farmed the place as tenant of his mother, but it is claimed that in the Spring of 1876, a different arrangement was entered into between them, by which he was to raise the grain for her at five dollars per acre.

The appellant testifies that in the spring of 1876 Benoni, her son, was not willing to rent the farm any longer, and was about to leave, and she, not wishing him to do so, contracted with him to raise the grain for $5 per acre, and upon those terms he remained upon the farm. Benoni swears that he thought it did not pay him to rent the place as he had been doing, and he wanted to leave the farm anyway, but finally made the contract to raise the grain for her at $5 per acre.

Dean Simpkins testifies: "I am son of the plaintiff. I live on that farm now. A year ago I lived four and a half miles north of that, on my farm. I saw this crop that is levied upon. It was mother's crop, as I understood it. She hired Ben. to raise it some time in the spring; he was to get $5 an acre. That contract was made at mother's house in Maquon. I was present and heard the contract. He said he wanted to quit the place. She said she did not want him to. Then he said he would hire to her to work by the month. She said she did

not want to hire him by the month, and I suggested she better hire him to raise it by the acre, if he would raise it that way, and she said she would. She asked me what it would be worth; I told her I had paid $5 per acre. He said he would do it for that, and she said she would give it. Then he went on and raised it."

The testimony of these three witnesses, in our opinion, stands uncontradicted upon the record. It is sought to weaken the force of this evidence by showing that Benoni, to all appearances, carried on the place the same as he had in former years; that he had at various times sold and fed grain claimed by his mother, and that he did other work on the farm besides raising the crop, and that he acted relative to the place the same as any other farmer would. The circumstances of the case, however, destroy all the force of this class of presumptive evidence.

The appellant, was at the time of the trial below, seventy-four years of age. She was living on the home farm, and her son Benoni was living with her. She was unable to work the farm or attend to ordinary business affairs, and to whom should she look for assistance in such matters, if not to him? It does not appear but that he had the love and respect for his widowed and aged mother which is so justly due her as the author of his being, and so becoming in the son, and, because actuated by that love he gratuitously rendered her all the assistance in his power, and conducted her business as he would his own, shall we conclude that their testimony is not to be believed? We see nothing in this record showing that the acts of the son are inconsistent with the testimony on the part of appellant, when considered in the light of their relations, and all the circumstances surrounding them.

Again, evidence was permitted to go to the jury tending to show that Benoni had given a chattel mortgage upon his personal property to his brother Dean, for the purpose of hindering and delaying his creditors, and that it had been foreclosed under circumstances that indicated its fraudulent character. While, in our opinion, the defendants failed upon the proofs in that regard, we think that such testimony should have been excluded from the jury, as the record in the cause fails to show

that the appellant was in any way or manner connected with it, or had any knowledge whatever of its consideration or its object.

We are not prepared to hold that a fraudulent conveyance of chattels to one person, is even presumptive proof that another and different transaction with other parties is alike fraudulent.

If it were thus to be presumed, it would be very unsafe to purchase property or make any contract relative to it, until you had first ascertained that the vendor had not prior thereto, been guilty of fraudulently conveying some of his other property.

The last clause of the fourth instruction given for the defendants, partakes too much of the character of a direction by the court to find for the defendants and was calculated to mislead the jury. The People v. Roach, 77 Ill. 25.

In our opinion, the verdict is so palpably against the evidence that the cause should be submitted to another jury.

The judgment will be reversed and the cause remanded.

Reversed and remanded.

LELAND, J. I have been unable to come to the same conclusion in this case as that arrived at by the other members of the court. I think it quite probable that the defendant in execution, Benoni Simpkins, and his mother, the appellant, after the former had been the tenant of the latter for nine or ten years, and in February or March, 1876, and about the time a large judgment was recovered against the son on a security debt, made precisely the arrangement, with Dean to witness it, to which the mother, and her sons Benoni and Dean testify, viz: That she should pay Benoni five dollars an acre for raising the crop for her in the year 1876. I think, however, with mental reservation that it should be performed in the same way as the contract between the parties had been performed for the nine of ten preceding years, to-wit: By Benoni paying rent, and having the crops for his own use, without being subjected to the inconvenience incident to the unpleasant position of a judgment debtor on a security debt. The arrangement, which to those not in debt was an unusual

Simpkins v. Berggren et al.

and unreasonable one, was I think when made, a general one without details, as to the meadow and pasture land, as to harvesting the crops, and as to their sale after they were gathered, as to whether the four dollars an acre or four cents a bushel, as the case might be, for gathering, and the five dollars an acre for raising, were to be paid when the work was completed, or from time to time as it progressed, as to whose stock should be fed out of the crops, and how this should be adjusted, who should furnish horses, implements, seed, etc., and how it was to be arranged in case of contribution in unequal proportions, etc. etc.

It was evidently a general arrangement that the crops were to be the mother's, and she was to pay the son for the raising and gathering of them, made without time to fix all the simulated details, because of the pressure of the $1,140.45 judgment of Feb. 24, 1876 against William Keck and Benoni Simpkins. The supposed details were gradually added, from time to time, as they became necessary to give symmetry to the structure, or structures, if there were two—as raising one, and gathering one. In answer to the question, what did you agree to give him for gathering it? the mother says four dollars an acre, at which time, I imagine, Benoni's countenance assumed a negative expression, plainly visible to judge and jury, but not capable of being reproduced here in ink, and she therefore said: " I don't know as that is a very high price; may be then it was four cents a bushel. It was something. I can't remember such things. I told him to go and gather the corn, and I would pay him for it. He came and asked me if he should gather it." That was after Housh levied upon it. She says that " under the five dollar an acre contract, we did not say who was to furnish the grain to feed the teams; nothing said about it, as I know of. He paid some of the hands, and I paid some; there was nothing said about that." In answer to a question as to what was said about the meadow land, she says there was nothing said about it. " *I don't think I want to give a history of my life.*" She said also that in 1876 he used the meadow land, just as he had years before, without anything being said about it. She says she don't know how many oats there were,

or what became of them. Don't know who thrashed them. Don't know whether he fed them to the horses as before. Mrs. Benoni Simpkins, whose relations with her husband, however, were inharmonious, says that Mrs. Simpkins told her, speaking of the grain, that she would have to replevy it to hold it; that he, Benoni, could not hold it, because everything was mortgaged; that it was best for her to do so, so they would not take it away from him; that he dare not replevy it, etc.

I do not perceive anything in the conduct of Benoni inconsistent with the relations of the mother and son being the same in 1876 as in previous years. The mother and her two sons are the only persons who speak of a changed condition of things; and the change, if any, was not mentioned to neighbors and friends, nor discovered by them. The sale by the mother to others of corn, and the keeping account of the amounts, was proper to know what was paid in corn for rent. So as to any corn she may have had for herself. Benoni used corn and oats as he would use his own, on the farm, and he removed a portion of that replevied to his livery stable, and used it there as his own, after he left the farm. It does not appear how and when, if ever, his mother paid the $5.00 an acre, nor the four cents a bushel. If their relations were nominally, they were not really, changed. Suffice it to say, without going into a more critical examination of all the circumstances, that it seems to me that the court and jury below probably got at the real truth. Even, however, if they did not, I would not be disposed to interfere with their conclusions, in a case of conflict like this.

A jury, with a woman for plaintiff, and a judgment creditor as the party in interest against her, rarely renders a verdict against the woman. It must be a clear case of awakened conscience or *vis major*, with the jury, I think, therefore, that there was something in the atmosphere surrounding the case, something in the pantomime of the trial below, plainly visible in the court-room in Knox, which is not discoverable in the printed abstracts, nor in the written record. There may be events of a conclusive character transpiring upon a trial which pen or types cannot well reproduce. I remember of hearing of

one, observed by some of the spectators, overlooked by others, which happened in a trial for burglary in this State some years ago, when burglaries were committed in the night time only. The question was one solely of the identity of the defendant, who was a stranger. A lady witness, in her evidence, misplaced a bureau. The prisoner leaned over and spoke to his attorney. The attorney immediately asked her if she was not mistaken as to the place in the room where it was situated. She reflected, and said she was.

It seems to me that the judgment debtor and the mother were alarmed by, and attempted to escape from the judgment for the security debt by the contrivance mentioned. At least the probability, according to the evidence, seems to me to be that way.

Complaint is made in appellant's brief that the court below allowed appellees to prove that the judgment debtor had made a chattel mortgage to Dean Simpkins, his brother, and to endeavor to show that it was fraudulent as to the creditors of Benoni. The evidence was admitted, and the court charged the jury in relation to it as follows:

"The court instructs the jury that the evidence introduced concerning the sale of property by Dean Simpkins, under chattel mortgage, and all evidence concerning said mortgaged property is immaterial, and not proper for the consideration of the jury, only so far as the proof may show such transaction to be connected with the transaction in question between the plaintiff and Benoni Simpkins, if such is the proof, and so far as it tends to throw light upon the transaction in question, and only such part of said evidence should be considered by the jury as connects the plaintiff with the transaction in reference to the property interests of Benoni Simpkins, if any."

It appears from the evidence that there was a sale of the property described in the chattel mortgage; that several of the Simpkins family, and those related by marriage, bid at the sale, and there is evidence that the property thus purchased, was shortly afterwards in possession of Benoni. Among other purchasers was the mother, who purchased hogs which, after the sale, went into the possession of Benoni. In short, there was

evidence, *pro and con*, as to whether this chattel mortgage was *bona fide* or not; and if not, whether the mother was assisting in the covering up, if there were any.   It seems to me that it was entirely proper to show that the members of the family, the mother included, were conspiring to shield Benoni from creditors, and that Benoni was in embarrassed financial condition; also to show what means he had, and what debts he owed.

After critically examining the instructions given for the defendant below, it seems to me that they are carefully and thoroughly prepared, and that they state the law accurately. My judgment is, that the case has been fairly tried, that the verdict is not clearly against the weight of the evidence, that substantial justice has probably been done, and that the judgment should be affirmed.